# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-DP-01500-SCT

*DAVID DICKERSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/25/2012 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRAD ALAN SMITH |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | ALEXANDER C. MARTIN |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 06/18/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. The Circuit Court of Copiah County convicted David Dickerson of capital murder, arson, and armed robbery. The jury sentenced him to death for the capital murder conviction; he was sentenced to twenty years for arson and forty years for armed robbery, to run consecutively. Dickerson appeals his convictions and death sentence. Finding no error, we affirm.

**Facts and Procedural History**

¶2. David Dickerson and Paula Herrington Hamilton were in a relationship in the mid-1990s, and they had a child, Courtney Dickerson. When the relationship ended, Dickerson had little contact with Paula and Courtney, unless it was negative. Paula later married Allen Hamilton. She had two children in addition to Courtney. Paula and her family lived on property near Wesson, Mississippi. Paula's sister, Robin Herrington, lived with them. Several other family members lived on the property as well, including an aunt, Linda Austin, who lived in a trailer behind Paula's house.

¶3. In 2010, Paula sought a protective order against Dickerson, claiming that he was stalking her and then-sixteen-year-old Courtney. She also filed a criminal affidavit alleging stalking. A protective order was entered, and a hearing was set for January 25, 2011, on the related criminal allegations. On the morning of January 25, 2011, Robin was outside Paula's house around 6:30 a.m. when she saw a man on the property. She told Paula, who went outside to investigate. Robin heard a gunshot, and Paula yelled for her to call 911. Robin testified that Paula came back to the house, covered with blood, and the man was following her and demanding keys to a van. Robin recognized the man as David Dickerson.

¶4. Paula's younger daughter, then-thirteen-year-old Kayla Herrington, was getting ready for school when her aunt Robin said a man was outside the house. Kayla testified that Paula went outside, then Kayla heard screaming, so Kayla went outside as well. Kayla saw a man "messing with a gun." She went back inside to get her little brother, then she heard two gunshots. Kayla took her little brother into the bathroom and locked the door behind them. Kayla testified that Robin joined the children in the bathroom, and Kayla called 911. Kayla

2

then looked out the window and saw the man pouring gas on the camper, then he took the gas can and ran off. Kayla testified that she heard her sister, Courtney, say that the man was David Dickerson.

¶5.    Courtney also was getting ready for school when her aunt Robin saw a man outside. Courtney testified that Paula went outside, then Courtney heard screaming and they all ran outside. She saw her father, David Dickerson, holding a gun to her mother's head. Courtney testified that Dickerson was demanding keys. Courtney tried to push Dickerson away from her mother, but Dickerson punched Courtney in the face. Paula told Courtney to go to her Aunt Linda's, so Courtney ran to Linda's trailer. A few moments later, Paula came to the trailer, drenched in blood. They let her in and locked the door behind her. Dickerson kicked the door in, and Linda pointed a gun at him. Dickerson pointed his gun at Courtney and threatened to shoot her if Linda did not put her gun down. Paula told Courtney to leave, so she and Linda fled the trailer. Courtney testified that Dickerson was holding a gas can, and she saw him pour gasoline on Paula and throughout the trailer. Linda ran to a neighbor's house, and Courtney ran back to Paula's house. Courtney then saw the trailer on fire.

¶6.    Reverend Thomas McCormick and Reverend Ken Hedgepeth were driving past Paula's house when they saw the trailer explode. They pulled into the driveway and ran toward the burning trailer. Reverends McCormick and Hedgepeth saw a man standing near the trailer. They found Paula, alive and on fire, trapped under the trailer. They testified that they pulled her away and that she smelled of gasoline. The men tried to help Paula, but she

3

died before police arrived. She had sustained gunshots to the head and back, stab wounds to the neck and trunk, and first-degree burns.

¶7. Police officers arrived and searched the area. After speaking with Paula's family members, Dickerson was named as a suspect and a be-on-the-lookout notice was issued. Kristina Stewart lived near Paula. She was driving home around 8:00 a.m., after taking her children to school, when she saw an unknown man emerge from the woods wet and covered in mud. She later identified Dickerson in a photographic lineup. Glenn and Betty Sue McInnis lived about a mile down the road. Around 9:30 a.m., Dickerson arrived at the McInnises' home and asked for gasoline. By that time, the McInnises knew about the situation and had been advised to be on alert for a suspicious person in the area. Glenn led Dickerson to his shop, intending to lead Dickerson away from his wife and home. Sheriff's deputies arrived and arrested Dickerson.

¶8. Investigators found Dickerson's motorcycle three-tenths of a mile from Paula's house. Officers found recently discarded clothing in an abandoned house not far from the scene. The clothing matched a description of Dickerson's clothing that day. A t-shirt with blood on it was later matched to Paula. A twenty-two-caliber pistol was discovered in a water well near the abandoned house. Ballistics determined that the pistol matched rounds found outside Linda's trailer as well as the bullet that was removed from Paula.

¶9. A grand jury indicted Dickerson for capital murder of Paula Hamilton, arson of Linda Austin's trailer, and armed robbery of Paula Hamilton. Dickerson maintained that he did not kill Paula and denied any involvement in the crimes. Before trial, Dickerson moved for a

4

determination of his competency to stand trial and a determination as to whether he was intellectually disabled. The court appointed forensic psychologist Dr. Criss Lott to evaluate Dickerson. Dr. Lott determined that Dickerson was not mentally retarded, but he was not able to determine whether Dickerson was competent to stand trial.

¶10. On Dr. Lott's recommendation, the court ordered further evaluation by the State Hospital at Whitfield to determine competency and intellectual disability. Dickerson was observed at the State Hospital for two months. Dr. Robert Storer, a forensic psychologist, and Dr. Reb McMichael, a forensic psychiatrist, concluded that Dickerson was mentally competent to stand trial and that he had no credible symptoms of mental illness. They found that Dickerson was uncooperative, malingering, and fabricating psychiatric symptoms. The doctors also concluded that Dickerson was not mentally retarded. The circuit court held a competency hearing, and all three doctors testified that Dickerson had the capacity to confer with counsel and that he was mentally competent to stand trial. Dickerson did not put on any evidence in the alternative. The trial court held Dickerson competent to stand trial.

¶11. Trial was held in July 2012. The jury heard testimony from several members of Paula's family who were eyewitnesses to the attack, the two pastors who stopped to help, Kristina Stewart, Glenn McInnis, several deputies who responded to the scene, the investigator from the State Fire Marshall's Office, and multiple forensic scientists from the Mississippi Crime Laboratory. Dickerson did not call any witnesses or put on any evidence. The jury returned guilty verdicts on all three counts.

5

¶12.   During the sentencing phrase, several of Dickerson's family members and two former employees of the Department of Human Services (DHS) testified about Dickerson's home life as a child. Several former coworkers and employers testified about Dickerson's work abilities. Dr. Lott testified as to his findings after evaluating Dickerson. Dr. Lott opined that Dickerson was not mentally retarded and that he thought Dickerson was exaggerating his psychological problems. Dr. Julie Schroeder, a social work professor, also testified. Dr. Schroeder had met with Dickerson and reviewed his school records, mental health records, test scores, and case file. She opined as to how Dickerson's personality disorders and borderline executive functioning deficit could have affected his behavior.

¶13.   The jury returned a unanimous verdict recommending the death penalty. However, the sentencing verdict failed to include any statutory aggravating factors. The circuit judge ordered the jury to review the jury instructions and return a verdict consistent with the requirements set forth therein. The jury returned with the verdict in proper form, recommending the death penalty and finding that the murder was committed while Dickerson was engaged in the commission of a burglary and that the offense was especially heinous, atrocious, and cruel. Dickerson filed a motion for a new trial, which the trial court denied. Dickerson appealed.

## Discussion

¶14.   Dickerson raises ten assignment of error on appeal. Three issues are related to his convictions, and the remainder pertain to sentencing:

I.      Whether the trial court erred in finding Dickerson competent to stand trial.

6

II.     Whether the trial court erred in failing to quash the arson indictment and in permitting the arson count to go to the jury.

III.    Whether reversal is required due to the erroneous admission of inflammatory and prejudicial evidence at the culpability phase of trial.

IV.     Whether the trial court erred by refusing Dickerson's requested penalty phase instruction regarding his *Atkins* intellectual disability defense.[1]

V.      Whether the trial court exacerbated the error and prejudice at the sentencing phase by refusing Dickerson's other proposed penalty phase instructions.

VI.     Whether the trial court erred in not entering a life sentence when the jury returned a sentencing verdict that failed to find any aggravating circumstances.

VII.    Whether the aggravating circumstances on which the jury was instructed were either legally or factually unsupported, rendering Dickerson's death sentence invalid.

VIII.   Whether Dickerson's death sentence must be vacated because it was imposed in violation of the Constitution of the United States.

IX.     Whether Dickerson's death sentence is constitutionally and statutorily disproportionate.

X.      Whether the cumulative effect of the errors mandates reversal of the guilty verdict and/or the death sentence.

The Court applies heightened scrutiny when reviewing capital murder convictions where the death penalty has been imposed. *Fulgham v. State*, 46 So. 3d 315, 322 (¶ 16) (Miss. 2010) (citing *Bishop v. State*, 812 So. 2d 934, 938 (¶ 7) (Miss. 2002)).

**I.  Whether the trial court erred in finding Dickerson competent to stand trial.**

---

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002).

7

¶15. Dickerson claims that the trial court's finding that he was competent to stand trial was against the overwhelming weight of the evidence and not supported by the expert testimony. The State maintains that the circuit judge's competency finding is supported by the evidence because all three experts opined that Dickerson was competent to stand trial. In the alternative, Dickerson contends that, even if he was competent to stand trial, the evidence of his history of mental illness precludes imposition of the death penalty. The State responds that Dickerson attempts to equate mental illness with mental retardation, but that, unlike the mentally retarded, the mentally ill are constitutionally eligible for the death penalty.

## A. Competence to Stand Trial

¶16. We will reverse a trial court's competency determination only if it is "manifestly against the overwhelming weight of the evidence." *Hearn v. State*, 3 So. 3d 722, 728 (¶ 14) (Miss. 2008) (quoting *Martin v. State*, 871 So. 2d 693, 698 (Miss. 2004)). The United States Supreme Court has defined the standard for competency to stand trial as: "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as factual understanding of the proceedings against him." *Hearn*, 3 So. 3d at 728 (¶ 15) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). To be deemed competent to stand trial, the Court has held that the defendant must be one:

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

8

*Hearn*, 3 So. 3d at 728 (¶ 15) (quoting *Martin*, 871 So. 2d at 697).

¶17. Prior to trial, the circuit judge granted Dickerson's request for a mental evaluation. At a competency hearing, and the court heard testimony from three doctors who had evaluated Dickerson. After hearing the expert testimony and considering their reports, the trial judge held that Dickerson was competent to stand trial. Dickerson now argues that the trial court's finding was against the overwhelming weight of the evidence and not supported by the expert testimony. He asserts that the trial court failed to consider the *Hearn* competency criteria in light of the heightened severity of his capital murder prosecution. *See Hearn*, 3 So. 3d at 728 (¶ 15). He also asserts that the experts erroneously excluded Dickerson's schizotypal personality disorder from their competency evaluation.

¶18. At the competency hearing, Dr. Lott, a forensic psychologist, testified that he had evaluated Dickerson, and he opined that Dickerson "has the capacity to confer with his attorney although he appears to remain uncooperative." He testified that, when he first evaluated Dickerson, Dickerson reported several psychotic symptoms, but Dr. Lott did not see the symptoms himself, so he referred Dickerson to the State Hospital. Dr. Lott explained that someone with a psychotic disorder can go through times of normalcy between psychotic episodes. Dickerson was evaluated at the State Hospital for two months.

¶19. In his first report, Dr. Lott opined that Dickerson had a factual understanding of the charges against him, but that he lacked the capacity to confer rationally with counsel. However, after doctors from the State Hospital "described his behavior as being atypical and not consistent with a genuine mental illness," Dr. Lott concluded that Dickerson was

9

competent and "capable of making a rational and factual assessment of his legal situation and proceeding rationally with his attorney." As to Dickerson's ability to consult with counsel, Lott opined that Dickerson understood what his lawyers would do.

¶20. Dr. Lott testified that he also had evaluated Dickerson in an unrelated 1997 matter and had recommended that Dickerson's mental health be monitored at that time. He discussed Dickerson's mental health treatment, including diagnoses of paranoid schizophrenia, major depressive disorder, and personality disorders with narcissistic features. Dr. Lott explained that Dickerson had received inpatient and outpatient treatment, was prescribed anti-psychotic medications, and had a history of noncompliance with treatment. Dr. Lott discovered that Dickerson had some academic difficulties as a child, but that he had reached the tenth grade. He noted that Dickerson's childhood lacked major behavioral problems but explained that Dickerson was described "as odd and as a loner." He found that Dickerson's behavior became increasingly odd and less independent over time. He also described undated letters Dickerson authored, which appeared disjointed and incoherent.

¶21. Dr. Lott discussed Dickerson's test results and noted that, while Dickerson gave fluid answers, he questioned the validity of Dickerson's score on a personality test. He testified that Dickerson had an adjusted full scale IQ of 71 but that he did not possess adaptive functioning deficits. He did find that Dickerson had a cognitive disorder. That disorder was evidenced by Dickerson's deficits in executive function, which is a person's ability to anticipate, problem-solve, and understand delayed gratification. The deficits inhibit one's

10

ability to anticipate consequences, learn from mistakes, and respond in a rational and non-impulsive manner.

¶22.    Dr. Robert Storer, also a forensic psychologist, testified next. Dr. Storer had evaluated Dickerson for competency, and he concluded that Dickerson did not suffer from any competency-related deficits.  He acknowledged some risk factors for post-traumatic stress disorder (PTSD), but he explained that they were unable to test Dickerson for PTSD because he would not cooperate.  He noted that Dickerson demonstrated anger and irritation during his hospitalization. Dr. Storer described Dickerson's diagnosis as "number one, malingering; number two, reported history of abuse as a child as a victim; Axis II, there was personality disorder and not otherwise specified with schizotypal paranoid and narcissistic features."

¶23.    Finally, Dr. Reb McMichael, a forensic psychiatrist, testified.  He likewise had examined Dickerson for the competency hearing.  He agreed with Dr. Storer that Dickerson has a personality disorder, but he found Dickerson competent to stand trial.  Dr. McMichael acknowledged the possibility that Dickerson has a major mental disorder that could affect his competence, but he saw no objective evidence of that during Dickerson's two-month stay at the hospital.  He noted a lack of signs of PTSD but explained that Dickerson's lack of cooperation prevented the discovery of reliable data.  After hearing the evidence, the circuit judge found Dickerson competent to stand trial.

¶24.    Dickerson argues that the first four competency criteria were not considered in light of the heightened severity of a capital murder prosecution.  In light of the expert testimony, we cannot agree.  While the first four criteria require specific findings about what the

defendant can do, the fifth criterion sets the bar that the defendant's satisfaction of the first four prongs must be commensurate with the severity of the case. The experts found that Dickerson suffered from no competency-related deficits, and nothing in their testimony indicates that the experts failed to view a capital murder proceeding as one of significant severity. Likewise, there is no indication that the trial judge failed to consider the evidence commensurate with the severity of the case.

¶25.    Dickerson also asserts that the experts erroneously excluded his schizotypal personality disorder from their competency evaluation. Against, we cannot agree. The transcript reflects that the experts considered Dickerson's past history of mental illness and found that Dickerson's condition did not affect his competency. The circuit judge's holding that Dickerson was competent to stand trial was supported by the expert testimony and was not manifestly against the overwhelming weight of the evidence. The issue is without merit.

### B. Mental Illness

¶26.    Dickerson also contends in the alternative that, even if he was competent to stand trial, his history of mental illness precludes imposition of the death penalty. He likens the mentally ill to the mentally retarded and to juveniles, who have "diminished personal culpability," and who are constitutionally ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), respectively. Dickerson asks the Court to hold that mentally ill defendants are exempt from the death penalty. The State responds that the Court should not extend *Atkins* and *Roper* to those with mental illness,

because the Supreme Court has not held that mental illness renders a criminal ineligible for the death penalty.

¶27. The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishment." In *Atkins v. Virginia*, the United States Supreme Court addressed whether the execution of mentally retarded individuals violated the Eighth Amendment and held that the death penalty was "not a suitable punishment for a mentally retarded criminal." *Atkins*, 536 U.S. at 321. Three years later, in *Roper v. Simmons*, the Supreme Court held that the death penalty is a disproportionate punishment for those who were under age eighteen when their crime was committed. *Roper*, 543 U.S. at 575. In both cases, the Supreme Court held that the penological justifications for the death penalty – retribution and deterrence – were not served by the execution of the mentally retarded or juveniles because those offenders had diminished culpability. *Roper*, 543 U.S. at 551; *Atkins*, 536 U.S. at 318-19.

¶28. Dickerson now seeks to have this Court extend *Atkins* and *Roper* to preclude the death penalty for the mentally ill. The Fifth Circuit has rejected this argument repeatedly. *See Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011) ("[T]he Fifth Circuit has recognized the distinction between the mentally ill and the mentally retarded and has held that *Atkins* only protects the latter."); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (Defendant claimed that *Atkins* and *Roper* "created a new rule of constitutional law . . . making the execution of mentally ill persons unconstitutional." The Fifth Circuit held that "[n]o such rule of constitutional law was created, however, by either *Atkins* or *Roper*."); *In*

13

*re Woods*, 155 Fed. App'x 132, 136 (5th Cir. 2005) ("*Atkins* did not cover mental illness separate and apart from mental retardation[.]").

¶29.     *Roper* exempted juvenile offenders from the death penalty, and *Atkins* exempted the mentally retarded.  Dickerson is neither under eighteen nor mentally retarded.  Therefore, he is not exempt from the death penalty under *Atkins* or *Roper*.  We will not extend those cases to apply to the mentally ill when "[t]he Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence." *Ripkowski*, 438 F. App'x at 303.  We cannot take the *Atkins* opinion – which was so specific to mental retardation that the Court cited and discussed the clinical definition of mental retardation – and apply it to all other mental disorders.  To do so would be no different than taking *Roper* and expanding it to preclude execution of criminals under age twenty-one, rather than age eighteen as the Supreme Court explicitly held.  Dickerson's alternative argument that the death penalty cannot be imposed on the mentally ill is without merit.

## II. Whether the trial court erred in failing to quash the arson indictment and in permitting the arson count to go to the jury.

¶30.     The indictment charged Dickerson with first-degree arson of a dwelling.  Dickerson challenged the sufficiency of the indictment in a pretrial motion, which the trial court denied. When the State rested, Dickerson again challenged the sufficiency of the indictment as well as the sufficiency of the evidence to prove arson through a motion for directed verdict. The trial court denied the motion, finding sufficient evidence to send the count to the jury.

### A. Sufficiency of the Indictment

14

¶31. Dickerson claims that the indictment for arson was insufficient. He asserts that, to be sufficient, "the indictment must allege and the evidence must establish beyond a reasonable doubt, *inter alia*, that the defendant set the fire and did so with the requisite intent to arson property." Dickerson writes that if the evidence does not support the charge, the indictment is insufficient. Dickerson seemingly confuses his sufficiency of the evidence claim with sufficiency of the indictment. Proof of the crime beyond a reasonable doubt need not be set forth in an indictment. We review the sufficiency of an indictment *de novo*. **Hardy v. State**, 137 So. 3d 289, 301 (¶ 43) (Miss. 2014) (quoting **Young v. State**, 119 So. 3d 309, 313 (¶ 10) (Miss. 2013)).

¶32. Count Two of the indictment against Dickerson charged him with first-degree arson. The heading on the indictment read: "Indictment for the offense of capital murder, arson, and armed robbery." Count Two provided:

> and that on or about the 25th day of January, 2011, in Copiah County, Mississippi, and within the jurisdiction of this court, the said David Dickerson did wilfully, unlawfully, feloniously and maliciously set fire to that certain dwelling owned and occupied by Linda Austin, contrary to and in violation of Section 97-17-1 of the Mississippi Code of 1972, and against the peace and dignity of the State of Mississippi.

Mississippi Code Section 97-17-1, under which Dickerson was charged, provides:

> Any person who willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, whether occupied, unoccupied or vacant . . . shall be guilty of arson in the first degree, and upon conviction thereof, be sentenced to the penitentiary for not less than five (5) nor more than twenty (20) years and shall pay restitution for any damage caused.

Miss. Code Ann. § 97-17-1(1) (Rev. 2014).

15

¶33.    To be sufficient, an indictment must include: "(1) the essential elements of the crime charged, (2) sufficient facts to fairly inform the defendant of the charge which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Hardy*, 137 So. 3d at 301 (¶ 43) (quoting *Young*, 119 So. 3d at 313 (¶ 11)). Dickerson's indictment charged that he "wilfully, unlawfully, feloniously and maliciously set fire to that certain dwelling owned and occupied by Linda Austin, contrary to and in violation of Section 97-17-1." The indictment covered the elements of the crime of first degree arson – (1) a person willfully and maliciously (2) sets fire to, burns, or causes to be burned (3) a dwelling house. The indictment included sufficient facts to inform Dickerson of the charge because it clearly set forth the required elements of the crime, identified the code section violated, and identified the crime as arson. Finally, by identifying the date of the alleged crime and the owner of the house, the indictment included sufficient facts that would enable Dickerson "to plead double jeopardy in the event of a future prosecution for the same offense." *Hardy*, 137 So. 3d at 301 (¶ 43). The indictment was sufficient, and the trial court did not err by denying Dickerson's pretrial motion to quash or his later challenges to the sufficiency of the indictment.

## B. Sufficiency of the Evidence

¶34.    Dickerson claims that the evidence presented at trial was insufficient to prove that he actually set the fire to and intended to burn the trailer. He claims that his pouring gasoline on Paula was merely part of his assault, but that there is no evidence to prove that it was done with the intent to set the trailer on fire. When considering the sufficiency of the evidence,

16

the Court views the evidence in the light most favorable to the State, gives the State the benefit of all reasonable inferences drawn from the evidence, and asks "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Conner v. State*, 138 So. 3d 143, 148 (¶ 7) (Miss. 2014) (internal citations omitted).

¶35. To prove first-degree arson, the State must prove that the burning of a dwelling house was willful and malicious. Miss. Code Ann. § 97-17-1 (Rev. 2014). An arson is willful when the fire is intentionally set, and malice is inferred from willfulness. *See Isaac v. State*, 645 So. 2d 903, 908 (Miss. 1994); *Barnes v. State*, 721 So. 2d 1130, 1134 (Miss. Ct. App. 1998). That the dwelling house of Linda Austin burned is not disputed. The only question is whether Dickerson set it on fire intentionally. While no witness observed Dickerson set the fire, the witnesses testified that Dickerson poured gasoline on Paula and around the trailer and that the trailer burst into flames. The pastors who saw the burning trailer and stopped to help saw a man standing near the trailer watching it burn. A reasonable juror could infer that Dickerson intentionally started the fire based on his violent attack on Paula, his pouring gasoline on her and throughout the inside of the trailer, and his presence as the trailer burst in flames with Paula inside. The State presented sufficient evidence to prove arson.

¶36. Dickerson's claims that the arson indictment was insufficient and that the evidence was insufficient to prove arson are without merit.

**III. Whether reversal is required due to the erroneous admission of inflammatory and prejudicial evidence at the culpability phase of trial.**

17

¶37. Dickerson contends that the circuit judge erred by admitting inflammatory and prejudicial evidence at trial – specifically, a 911 call, color autopsy photographs, and prior bad acts evidence. We review a circuit judge's decision to admit or exclude evidence for an abuse of discretion. *Cole v. State*, 126 So. 3d 880, 883 (Miss. 2013) (citing *Haggerty v. Foster*, 838 So. 2d 948, 958 (Miss. 2002)).

### A. 911 Call

¶38. The State entered into evidence the recording of the 911 call made by Kayla during the attack. Dickerson objected, claiming that the recording was hearsay and not relevant. The trial judge allowed the call to be admitted, holding that it satisfied the present sense impression exception to the hearsay rule. Dickerson claims that the trial judge erred because the call is not relevant and cannot survive the balancing test of Mississippi Rule of Evidence 403. He claims that, because the call consists of undifferentiated screaming, it possesses little probative value and is inherently prejudicial.

¶39. The 911 call played for the jury lasts approximately two minutes. The call mostly consists of unintelligible background noise and screaming and the operator encouraging the caller to speak. Ten seconds into the call, someone screams "David!" About a minute later, Kayla provides an address. Near the end of the call, Kayla says that she saw someone outside, that her mother went to see what he was doing, and that he had a gun.

¶40. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. Even if evidence is relevant, the

18

circuit judge may exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Miss. R. Evid. 403. The reference to "David" has a tendency to establish identity, and the caller's statement that her mother went outside to confront a man with a gun has a tendency to explain the course of events. Thus, the call is relevant under Rule 401. Further, the probative value is not substantially outweighed by any unfair prejudice, because the call's lack of substance diminishes its prejudicial impact. Some screams can be made out from the background noise, but much of the call is entirely unintelligible. The circuit judge did not abuse his discretion by allowing the State to play the call for the jury.

### B. Autopsy Photographs

¶41. The State's pathologist identified two color photographs of Paula's gunshot wounds, which were entered in evidence over Dickerson's objection that black and white copies would provide the same probative value with less unfair prejudice. Dickerson now argues that the circuit judge erred because he did not force the State to accept his proposed stipulation on cause and manner of death, obviating the need for autopsy evidence, and because he overruled his objection that black and white versions would have provided the same probative value.

¶42. The "admission of photographs into evidence is within the discretion of the trial judge, and such admission will be upheld on appeal absent a showing of an abuse of that discretion[.]" *Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990) (citing *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989)). Relevant photographs may be admitted despite "the mere fact

that they are unpleasant or gruesome[.]" ***Sudduth***, 562 So. 2d at 70 (citing ***Davis***, 551 So. 2d at 173; ***Boyd v. State***, 523 So. 2d 1037, 1040 (Miss. 1988)).

¶43. Before trial, Dickerson offered to stipulate the following: "Paula Hamilton, was killed on January 25, 2011, in Copiah County, Mississippi, by two gunshot wounds." Dickerson separately offered to stipulate to the decedent's identity. Each offer asked the circuit judge to order the State to accept the stipulation and made clear that the intent behind the stipulation was to prevent the presentation of potentially inflammatory evidence. The circuit judge refused to require the State to stipulate anything.

¶44. Dickerson argues that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." ***Sudduth***, 562 So. 2d at 70 (citing ***Davis***, 551 So. 2d at 173). He also cites ***State v. Lindsey***, in which the Louisiana Supreme Court found that a "stipulation to the matter sought to be proved by the photographs necessarily bears upon a balancing of the probative value of the photographs against their prejudicial effect." ***State v. Lindsey***, 404 So. 2d 466, 475 (La. 1981) (citing ***State v. Landry***, 388 So. 2d 699 (La. 1980); ***State v. Gilmore***, 332 So. 2d 789 (La. 1976)). However, the ***Lindsey*** Court went on to write that "the state cannot be robbed of the fair and legitimate moral force of its case merely because the stipulation is offered." ***Lindsey***, 404 So. 2d at 475 (citing ***State v. Harvey***, 358 So. 2d 1224 (La. 1978); ***Gilmore***, 332 So. 2d at 789).

¶45. Dickerson's stipulations would not have obviated all of the probative value of the photographs. Though he offered to stipulate that Paula was killed by gunshot, Dickerson did

20

not offer to stipulate that she was shot intentionally. The gruesome nature of Paula's injuries, shown in the photographs, had some probative value to show that intent. Likewise, the circuit judge concluded that the color photographs provided greater probative value than the black and white versions. While the black and white photograph in the record is relatively clear, it does not reflect the burns Paula suffered. We cannot say the judge abused his discretion in allowing the color autopsy photographs to be admitted.

### C. Prior Bad Acts Evidence

¶46. Dickerson contends that the circuit judge erred by admitting evidence of stalking charges and a protective order against him. Dickerson filed a motion *in limine* under Mississippi Rules of Evidence 403 and 404 to exclude any prior bad acts evidence the State intended to use. That motion was discussed briefly in a pretrial hearing in which Dickerson's counsel did not ask the circuit judge to rule on his motion at that time, but asked only for an opportunity to object before any prior bad acts evidence was admitted at trial. At that time, the State made known its intent to introduce evidence of a court date in an adversarial proceeding involving Paula and Dickerson on the day of the murder.

¶47. At trial, the State called Carolyn Morgan, Justice Court Clerk for Copiah County at the time of the murder. She testified that she had mailed Dickerson a notice to appear for a hearing on the day of the murder and that she confirmed that Dickerson knew of the hearing by phone the day before. Morgan also identified a protective order relating to domestic abuse that was filed by the victim against Dickerson and signed by a judge on October 12, 2010. No contemporaneous objection was lodged. On cross-examination, Morgan testified that the

21

protective order also was filed by Dickerson's daughter, Courtney; that it indicated no weapons were used in the domestic abuse; and that it prohibited contact between Dickerson and the petitioners.

¶48.    On redirect, Morgan clarified that both Paula Hamilton and Courtney Dickerson were protected by the order.  The State then clarified that the October 2010 order was only temporary in nature and asked if it related to the hearing set for the day of the murder. Morgan responded that it was temporary, but that it did not relate to the scheduled hearing. At that point the State excused the witness and Dickerson's counsel asked to approach the bench.  There, Dickerson's counsel expressed concern that the jury had heard evidence of an unrelated incident.  Both Dickerson's counsel and the State stated that they believed Morgan would testify that the October order did relate to the January hearing.  After the judge commented that the witness was gone and there was nothing he could do, Dickerson's counsel moved for a mistrial.

¶49.    Defense counsel explained that the State had informed them of its intent to use the October 2010 protective order, but it had led defense counsel to believe it was the same matter to be addressed in the hearing on the day of the murder, and that the order was therefore relevant to the prosecution.  But now, based on Morgan's testimony, it appeared that the October order related to other, irrelevant prior acts.  The judge then explained that Dickerson's counsel had made no contemporaneous objection for him to rule on.  The State then offered to recall Morgan in order to clarify her testimony, to which Dickerson's counsel agreed, saying that would take care of the objection.  The State then proffered Morgan's

22

further testimony. She explained that the hearing on the day of the murder was to adjudicate the criminal stalking charges related to the October 2010 protective order. Dickerson's counsel then expressed that they had no objection to the proffered clarification, and Morgan testified to the clarification in front of the jury without objection or cross-examination from Dickerson's counsel.

¶50. Generally, failure to lodge a contemporaneous objection to the admission of evidence waives the issue on appeal; the contemporaneous objection requirement is not diminished in death penalty cases. *Williams v. State*, 684 So. 2d 1179, 1189 (Miss. 1996); *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987). Though Dickerson moved to exclude the prior bad acts evidence, his counsel withdrew the objection after the State presented Morgan's clarified testimony; Dickerson's counsel forfeited the issue for appeal. While the rule does not eliminate the Court's authority to recognize plain error, the circuit judge's admission of the evidence cannot constitute plain error because Mississippi Rule of Evidence 404(b) allows the admission of prior bad acts evidence for purposes other than propensity, such as motive. Miss. R. Evid. 103(d), 404(b). The fact that Dickerson was to appear in court on the day of the murder to face a criminal stalking charge – by which he was alleged to have stalked the murder victim – certainly provided motive for the crime. The trial court did not err in admitting evidence of the stalking charge and protective order.

    **IV. Whether the trial court erred by refusing Dickerson's requested penalty phase instruction regarding his *Atkins* intellectual disability defense.**

23

¶51. In *Atkins v. Virginia*, the United States Supreme Court ruled that the Eighth Amendment's ban of cruel and unusual punishment categorically prohibits the execution of the mentally retarded.[2] Then the Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction" against the execution of mentally retarded offenders. *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)). In *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), the Court took on the task of "developing appropriate ways to enforce" the prohibition of execution of mentally retarded offenders. The Court has since applied *Atkins* and *Chase* more than two dozen times.

> The standards, definitions, and procedure for making a determination of mental retardation were provided by this Court in *Chase v. State*. A defendant must prove that he meets the standard for mental retardation by a preponderance of the evidence. *Chase*, 873 So. 2d at 1028 (quoting *Foster v. State*, 848 So. 2d 172, 175 (Miss. 2003)). The circuit court, sitting without a jury, will consider and decide whether the defendant is mentally retarded. *Id.*

> This Court in *Chase* adopted the clinical definition of mental retardation set forth by the Supreme Court in *Atkins*. "Mental retardation refers to substantial limitations in present functioning." *Chase*, 873 So. 2d at 1027 (quoting *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. 2242). According to the AAMR, mental retardation is characterized by: (1) "significantly subaverage intellectual functioning," (2) "existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work," (3) which "manifests before age 18." *Id.* The definition of mental retardation from the APA is almost identical.

> Persons with an IQ of 50-55 to 70 typically are described as having "mild mental retardation," but "mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75." *Chase*, 873 So. 2d at 1028 (quoting *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. 2242). This Court has said that

---

[2] We recognize that the phrase "mentally retarded" meets with disfavor in modern discourse. However, because the scope of *Atkins* is at issue in the instant appeal, we continue to use the phrase as it was used by the Supreme Court in *Atkins*.

the Minnesota Multiphasic Personality Inventory-II (MMPI-II) should be administered, because "its associated validity scales make the test best suited to detect malingering." *Chase*, 873 So. 2d at 1028 (quoting *Foster*, 848 So. 2d at 175). In addition to the MMPI-II, experts should use "any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering." *Chase*, 873 So. 2d at 1028 n.19. *See also Lynch v. State*, 951 So. 2d 549, 557 (Miss. 2007) (trial courts are free to use any approved test to determine mental retardation and/or malingering).

*Goodin v. State*, 102 So. 3d 1102, 1112-13 (¶¶ 31-34) (Miss. 2012).

¶52. Prior to trial, Dickerson filed a motion for a mental evaluation to determine competency to stand trial and intellectual disability. The court granted the motion, Dickerson was evaluated, a hearing was held, and three experts testified that Dickerson was not mentally retarded. At trial, Dickerson sought to submit to the jury the issue of whether he was intellectually disabled. He submitted a jury instruction that set forth the *Atkins* criteria for establishing mental retardation and directed the jury to cease deliberations if it determined that the evidence established that the *Atkins* criteria were met. The trial court refused the instruction. Dickerson now claims that he should have been allowed to submit that issue to the jury. He asserts that a defendant is allowed to have all theories of defense presented to the jury. Dickerson also contends that the United States Constitution mandates the jury's consideration of the *Chase* criteria. In the alternative, Dickerson claims that the jury was not adequately instructed to consider his intellectual capacity as a mitigating factor in the absence of a finding that he was mentally retarded.

¶53. Although the Court has held that the determination of whether the defendant is mentally retarded is to be made by the circuit court sitting without a jury, *Goodin*, 102 So.

3d at 1112 (¶ 31) (citing *Chase*, 873 So. 2d at 1028 (¶ 71)), for purposes of today's case we do not revisit that holding and address whether he would be entitled to have any *Atkins* issues presented to the jury, as he produced no evidence to support the giving of such an instruction. Dickerson was evaluated for mental retardation prior to trial, and three experts concluded that Dickerson was not mentally retarded. Further, as discussed under Issue I above, because *Atkins* exempts only the mentally retarded from execution, not the mentally ill, and there is no evidence in the record indicating that Dickerson is mentally retarded, *Atkins* is inapplicable to Dickerson's case.

¶54.    Dickerson's argument that due process requires that he be allowed to present his intellectual disability theory of defense to the jury is without merit. Defendants are entitled to have their defense theories submitted to the jury, but that right is not unlimited; for a jury instruction to be given it must be supported by the evidence presented. *Hardy v. State*, 137 So. 3d at 302 (¶ 49) (quoting *Austin v. State*, 784 So. 2d 186, 192 (Miss. 2001)). Dickerson's requested instruction regarding mental retardation was not supported by the evidence. In *Chase*, establishing the procedure for reaching a determination of mental retardation, the Court wrote:

> We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
>
> 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
>
> 2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

26

*Chase v. State*, 873 So. 2d at 1029 (¶ 74). No expert opined that Dickerson is mentally retarded. In fact, the experts concluded that Dickerson was *not*, and Dickerson offered no evidence to the contrary. Because no expert opined that Dickerson met the definition of mental retardation to a reasonable degree of certainty, as a matter of law, the jury could not find that Dickerson was mentally retarded and exempt from execution. The trial judge did not err in denying the jury instruction because evidence presented was legally insufficient to support a finding of mental retardation.

¶55. Finally, Dickerson's alternative argument that the jury was not adequately instructed to consider his intellectual capacity as a mitigating factor in the absence of a finding that he was mentally retarded is without merit. Sentencing instruction D-12, which the circuit judge granted, told the jury that it could consider as mitigating evidence that Dickerson suffers from mental illness, suffers from brain damage, and has an IQ score in the mentally retarded range among other enumerated mitigating factors. That instruction also told the jury it could consider any other factors it found to be mitigating. The jury received sufficient instruction regarding consideration of Dickerson's diminished mental capacity in mitigation.

**V. Whether the trial court exacerbated the error and prejudice at the sentencing phase by refusing Dickerson's other proposed penalty phase instructions.**

¶56. Dickerson argues that the circuit judge erred by denying his proposed sentencing phase instruction D-11, which explained what would happen if the jury could not unanimously agree on a sentence. Proposed instruction D-11 read: "The Court instructs the jury that if you cannot, within a reasonable time, agree as to punishment, the Court will

27

dismiss you and impose a sentence of imprisonment for life without the benefit of parole."

The State contends that the issue is barred because Dickerson did not object contemporaneously to the circuit judge's denial of his proposed instruction. The State also argues that the Court repeatedly has concluded that the sentencing jury need not receive similar instructions.

¶57. "It is well established that when error is predicated upon the denial of a jury instruction requested by the defendant, the defendant need not make a contemporaneous objection to the denial in order to preserve the error for appeal." *Neal v. State*, 15 So. 3d 388, 408 (¶ 50) (Miss. 2009) (citing *Green v. State*, 884 So. 2d 733, 736 (Miss. 2004)). Errors pertaining to the refusal of jury instructions are "procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury." *Neal*, 15 So. 3d at 408 (¶ 50) (quoting *Rubenstein v. State*, 941 So. 2d 735, 789 (Miss. 2006) (quoting *Edwards v. State*, 737 So. 2d 275, 310 (Miss. 1999))). Dickerson's argument is not procedurally barred for his failure to make a contemporaneous objection.

¶58. The giving of a jury instruction is "within the sound discretion of the trial court." *Flowers v. State*, 158 So. 3d 1009, 1062 (¶ 128) (Miss. 2014) (quoting *Gillett v. State*, 56 So. 3d 469, 496 (¶ 67) (Miss. 2010) (quoting *Rubenstein*, 941 So. 2d at 787 (¶ 239))). When reviewing errors related to jury instructions:

> This Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. *Thomas v. State*, 818 So. 2d 335, 349 (Miss. 2002). A defendant is entitled to have jury instructions which present his theory of the case. *Id.* This entitlement is

limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Id.*

*Flowers*, 158 So. 3d at 1062 (¶ 128) (quoting *Gillett*, 56 So. 3d at 496 (¶ 67) (quoting *Walker v. State*, 913 So. 2d 198, 234 (¶ 132) (Miss. 2005))).

¶59.    In *Gillett v. State*, we addressed the circuit judge's refusal to grant a nearly identical instruction.  The proffered instruction in *Gillett* read: "If you cannot, within a reasonable time, agree as to punishment, I will dismiss you and impose a sentence of life without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this." *Gillett*, 56 So. 3d at 515 (¶ 138). The Court found no error because the sentencing instructions given adequately informed the jurors of the three outcomes they could reach: a unanimous sentence of death, a unanimous sentence of life, or that they were unable to reach a unanimous sentence.  *Id.* at 516 (¶ 140) (citing *Edwards*, 737 So. 2d at 316-17 (in which a similar instruction was refused)).  Because the instructions in *Gillett* informed the jurors that they could return without an unanimous sentence, the jury did not need to know what would happen in that event.  *Id.*[3] The United States Supreme Court has held that the Eighth Amendment does not require an instruction on the sentence imposed if the jury does not reach a unanimous sentence in a capital murder trial.  *Jones v. State*, 527 U.S. 373, 381-82

---

[3] The Court has reached the same conclusion in multiple cases. *See, e.g., Corrothers v. State*, 148 So. 3d 278, 317-18 (¶¶ 107-08) (Miss. 2014); *Edwards v. State*, 737 So. 2d 275, 316-17 (Miss. 1999); *Wilcher v. State*, 697 So. 2d 1123, 1136 (Miss. 1997); *Holland v. State*, 705 So. 2d 307, 353-54 (Miss. 1997). Dickerson contends that the cases are distinguishable because the failure to grant the instruction in his case exacerbated the circuit judge's errors in failing to grant other instructions.  Because we do not find that the circuit judge erred by failing to grant any jury instruction, the claim is without merit.

(1999). As in *Gillett*, the instructions granted in the instant case informed the jury of all three options, and the circuit judge did not err by denying Dickerson's proposed instruction D-11.

**VI. Whether the trial court erred in not entering a life sentence when the jury returned a sentencing verdict that failed to find any aggravating circumstances.**

¶60. The jury deliberated for more than an hour and a half before returning with a unanimous sentencing verdict, which the clerk read aloud. The verdict found beyond a reasonable doubt that:

> The defendant actually killed Paula Hamilton, that the defendant attempted to kill Paula Hamilton, that the defendant intended that the killing of Paula Hamilton take place, and that the defendant contemplated that lethal force would be employed, and is all sufficient to impose the death penalty, and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the defendant should suffer death.

Recognizing that the verdict failed to reflect whether the jury found the existence of any statutory aggravating factor, the judge asked counsel to approach the bench. The following exchange occurred:

> THE COURT: There are no aggravating circumstances listed. The verdict form did say that if there were insufficient mitigating circumstances to outweigh the aggravating circumstances. Don't those need to be listed?
>
> MR. DeGRUY: Without aggravating circumstances?
>
> THE COURT: Do I need to instruct the jury to return and reform the verdict to comply with the Instruction Number 2?
>
> MR. DeGRUY: We would like for a verdict of life since there were no findings.

30

The circuit judge then instructed the jury to return to the jury room, look at the instructions, and reform their verdict to comply with those instructions.

¶61. When the jury had been deliberating the second time for twenty minutes, the following exchange occurred:

> MR. DeGRUY: Your Honor, just to continue in making the record, the jury has now been in the back jury room for over 20 minutes.
>
> THE COURT: I don't know how long they've been back there. They've been back there for a while.
>
> MR. DeGRUY: It appears they're confused by the instruction. They possibly found nonstatutory aggravators, which was not proper. The fact that they did not return a finding beyond – of any aggravating factors as of yet – we've now been in deliberations almost two hours. That is a reasonable time passed, and we ask that the judge dismiss the jury and impose a life sentence.
>
> THE COURT: Well, I appreciate your request, Counsel. I understand the request. However, the jury has been back – I don't know how long they were out originally, but they have returned a verdict that was not in proper form. They've been back a few minutes. I'm not sure how long they've been back. And there very well may be that there was confusion as to Jury Instruction Number 2, the Court's Instruction Number 2, without knowing that unless the jury brings back in a comment on the extent of the confusion, if any. However, the Court will allow the jury to redo its verdict and bring that back in the proper form.

The jury then returned a corrected unanimous sentence, recommending the death penalty and finding the existence of two aggravating factors: that the murder was committed while Dickerson was engaged in the commission of a burglary and that the offense was especially heinous, atrocious, and cruel. Dickerson filed a motion for a new trial, which the trial court denied. Dickerson argues that the circuit judge was obligated to impose a life sentence when the jury returned the original verdict without finding any aggravating factors.

¶62.    Mississippi Code Section 99-19-103 provides that "[t]he jury . . . shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt. Unless at least one (1) of the statutory aggravated circumstances enumerated in Section 99-19-101 is so found . . . the death penalty shall not be imposed."  Miss. Code Ann. § 99-19-103 (Rev. 2007). Section 99-19-11 states that "[i]f the verdict is informal or defective the court may direct it to be reformed at the bar."  Miss. Code Ann. § 99-19-11 (Rev. 2007).

¶63.    In the same way the jury is required to find the existence of at least one aggravating factor, the jury must also find that at least one *Enmund* factor exists. *King v. State*, 960 So. 2d 413, 443 (Miss. 2007) (citing *Enmund v. Florida*, 458 U.S. 782 (1982); Miss. Code Ann. § 99-19-101(7) (Rev. 2000)).  In *King v. State*, the sentencing jury omitted any *Enmund* finding from its verdict sentencing the defendant to death. *King*, 960 So. 2d at 443. The circuit judge instructed the jury that its verdict did not comport with the court's instructions, directed their attention to the *Enmund* portion of the instructions, and sent the jury to deliberate further. *Id.* at 443-44.  On appeal, King argued that the court's instruction tainted the jury's verdict. *Id.* We disagreed and affirmed the defendant's death sentence because the instruction did not tell the jury that it was required to find an *Enmund* factor. *Id.* at 444.  Likewise, in the instant case, the judge only instructed the jury to reform their verdict to comply with the given instructions.  He did not instruct the jury to find aggravating factors.  There is no evidence that the circuit judge's instruction to reform the sentencing verdict tainted the jury's ultimate conclusion.

¶64. Further, Section 99-19-11 specifically authorizes the judge to have the jury reform its verdict if the original verdict was defective. Miss. Code Ann. § 99-19-11 (Rev. 2007). The jury's original verdict did not contain an affirmative finding that no aggravating factor existed; in fact, it alluded to a finding that aggravating factors had been found by stating "that there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Thus, it seems that the jury's error was a technical defect that could be reformed under the statute.

¶65. Dickerson also contends that the language referencing aggravating factors in the first sentencing verdict should be viewed as an indication that the jury considered non-statutory aggravating factors. He claims that the consideration of non-statutory factors is further evidenced by the fact that the original sentencing verdict found all four *Enmund* factors, while the reformed verdict found only one. Dickerson cites *Holland v. State*, 587 So. 2d 848 (Miss. 1991), where the Court reversed when the jury deliberated sentencing before the issue was submitted, and Dickerson contends that the judge's reformation instruction created a similar problem in the instant case. In *Holland*, the jurors sent a note to the trial judge expressing that they had reached a unanimous sentence, but the judge had not yet submitted that issue to the jury. *Holland*, 587 So. 2d at 872. Thus, the jurors' error was definite. Here, Dickerson's concerns are merely speculative. While mentioning aggravating factors in the first sentencing verdict could refer to impermissible non-statutory factors, it just as easily could refer to statutory ones. The mere fact that the jury amended its *Enmund* findings

33

seems to be of no consequence, as Dickerson has not cited any authority to say that a jury sent to reform its defective verdict may not conduct further substantive deliberations.

¶66.    We hold that the circuit judge did not err by instructing the jury to reform its verdict.

> **VII.    Whether the aggravating circumstances on which the jury was instructed were either legally or factually unsupported, rendering Dickerson's death sentence invalid.**

¶67.    The jury was instructed to consider two statutory aggravating factors: whether the capital offense was committed while the defendant was engaged in the commission of a burglary and whether the offense was especially heinous, atrocious, or cruel. *See* Miss. Code Ann. § 99-19-101(5)(d), (i) (Rev. 2007). Dickerson claims that the aggravating factors were not legally or factually supported and that, even if his conviction is affirmed, the matter must be remanded for resentencing. We review the trial court's decision to allow or deny jury instructions for abuse of discretion. *Gillett*, 56 So. 3d at 505 (¶ 105) (citing *Rubenstein*, 941 So. 2d at 787).

### A. Killing During the Commission of a Burglary

¶68.    Dickerson argues that the circuit judge erred by instructing the sentencing jury on the felony-murder aggravating factor because that same factor had been used in the guilt phase to elevate the killing to capital murder. Dickerson acknowledges that both the Mississippi Supreme Court and the United States Supreme Court have accepted the practice, but suggests those opinions are wrongly decided, and he argues that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), compel a different result.

34

¶69.    In *Lowenfield v. Phelps*, 484 U.S. 231 (1989), the United States Supreme Court held

that having the jury find aggravating circumstances serves to satisfy the Eighth Amendment's

dictate that capital murder statutes narrow the imposition of the death penalty to the most

deserving offenders.  *Lowenfield*, 484 U.S. at 244.  The Supreme Court concluded that the

jury can narrow the class of offenders in either the guilt or sentencing phase.  *Id.* at 244-45.

Relying on *Lowenfield* – and specifically rejecting nearly identical arguments in which the

defendant relied on *Apprendi* and *Ring* – the Court has repeatedly held that "evidence of the

underlying crime can properly be used both to elevate the crime to capital murder and as an

aggravating circumstance."  *Gillett*, 56 So. 3d at 510 (¶ 119) (quoting *Ross v. State*, 954 So.

2d 968, 1014 (¶ 106) (Miss. 2007) (citing *Bennett v. State*, 933 So. 2d 930, 954 (Miss. 2006);

*Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001); *Smith v. State*, 729 So. 2d 1191, 1223

(Miss. 1998); *Bell v. State*, 725 So. 2d 836, 859 (Miss. 1998))).[4]

## B. Especially Heinous, Atrocious, or Cruel

¶70.    Dickerson argues that the State presented insufficient evidence to support an

instruction on the especially heinous, atrocious, or cruel aggravating factor because his

mental capacity so affected his moral judgment that his actions could not be considered

especially heinous, atrocious, or cruel.  The State contends that his claim is procedurally

barred because Dickerson did not object to the instruction at trial.  Dickerson admits that he

---

[4] "[T]his Court has repeatedly rejected similar arguments based on *Ring* and *Apprendi*, holding both of them inapplicable to Mississippi's capital sentencing scheme." *Ross*, 954 So. 2d at 1014 (¶ 119) (citing *Bennett*, 933 So. 2d at 952).

failed to lodge a contemporaneous objection but suggests that the claim should be reviewed for plain error.

¶71.    We apply the plain-error rule only if "a defendant's substantive or fundamental rights are affected." *Foster v. State*, 148 So. 3d 1012, 1018 (¶ 20) (Miss. 2014) (quoting *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013)). Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. *Id.* Only if the error "resulted in a manifest miscarriage of justice" will reversal occur. *Foster*, 148 So. 3d at 1018 (¶ 20) (quoting *Williams v. State*, 134 So. 3d 732, 736 (Miss. 2014)).

¶72.    We have held that "'[t]he number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged' may all be considered as evidence supporting a jury's finding of the HAC aggravator." *Batiste v. State*, 121 So. 3d 808, 870 (¶ 172) (Miss. 2013) (quoting *King v. State*, 960 So. 2d 413, 441 (¶ 54) (Miss. 2007) (quoting *Manning v. State*, 735 So. 2d 323, 349 (¶ 64) (Miss. 1999))). When evidence to that effect has been presented to the jury, the Court has affirmed the circuit judge's decision to grant an instruction on the especially heinous, atrocious, and cruel aggravating factor. *See, e.g., Batiste*, 121 So. 3d at 870 (¶ 172); *King*, 960 So. 2d at 441 (¶ 54); *Manning*, 735 So. 2d at 349-50 (¶ 64).

¶73.    In the instant case, the State presented evidence that Paula suffered multiple gunshot wounds, multiple stab wounds, and significant burns in a drawn-out assault.  Evidence was presented that Paula was still alive when the trailer was set on fire.  Multiple weapons were

used and multiple wounds were inflicted. There is no question that the evidence presented supported an especially heinous, atrocious, and cruel instruction. While the jury may have considered whether Dickerson's mental health reduced his moral culpability, his mental status makes the crime no less heinous, atrocious, or cruel. The judge did not err in granting the instruction.

¶74. Dickerson also contends that the instant aggravating factor is unconstitutionally vague and overbroad. "This Court has recognized that the 'especially heinous, atrocious or cruel' aggravating circumstance, without limiting instruction, is unconstitutionally vague and, consequently, an invalid aggravating circumstance." *Brown v. State*, 798 So. 2d 481, 501 (¶ 44) (Miss. 2001) (citations omitted). We have held that, at a minimum, the "instruction must define a 'heinous, atrocious, or cruel' offense as 'a conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *Batiste*, 121 So. 3d at 870 (¶ 171) (quoting *King*, 960 So. 2d at 440 (¶ 52)). The United States Supreme Court has approved use of that language, holding that "this narrowing construction was not unconstitutionally vague." *King*, 960 So. 2d at 440 (¶ 52) (citing *Bell v. Cone*, 543 U.S. 447, 457-58 (2005)).

¶75. In the instant case, the especially heinous, atrocious, or cruel instruction given to the jury read:

> The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital

37

murders – the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find evidence, beyond a reasonable doubt, that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or tortuous death was suffered by the victim then you may find this aggravating circumstance.

The instruction included the language approved in *Bell v. Cone*, that the offense must be "a conscienceless or pitiless crime which is unnecessarily torturous to the victim," and went even further to define heinous, atrocious, and cruel and to include specific examples of what that type of behavior could look like.  The instruction was not unconstitutionally vague or overbroad.  Dickerson's claim is without merit.

### VIII. Whether Dickerson's death sentence must be vacated because it was imposed in violated of the Constitution of the United States.

¶76.   Dickerson argues that his death sentence must be vacated because of several constitutional errors, all of which render Mississippi's sentencing scheme unconstitutional. He acknowledges that the Court and the United States Supreme Court have declined to adopt his contentions, but he urges the Court to overrule its prior decisions. We decline to do so.

### A. Indictment

¶77.   Dickerson claims that failure to include aggravating circumstances in the indictment renders the sentence unconstitutional.  We have rejected the argument repeatedly. *See, e.g., Batiste v. State*, 121 So. 3d 808, 871 (¶¶ 174-76) (Miss. 2013); *Gillett v. State*, 56 So. 3d 469, 510-11 (¶ 120) (Miss. 2010); *Goff v. State*, 14 So. 3d 625, 665 (¶¶ 173-75) (Miss. 2009); *Ross v. State*, 954 So. 2d 968, 1014 (¶ 106) (Miss. 2007); *Bennett v. State*, 933 So.

2d 930, 954 (¶ 83) (Miss. 2006); ***Brown v. State***, 890 So. 2d 901, 918 (¶¶ 60-62) (Miss.

2004).  Alleged aggravating circumstances do not have to be included in an indictment.

## A. *Enmund* **Factors**

¶78.    Dickerson claims that Mississippi Code Section 99-19-101, under which he was

sentenced, is unconstitutional under ***Enmund v. Florida***, 458 U.S. 782 (1982), and ***Tison v.***

***Arizona***, 481 U.S. 137 (1987).  Section 99-19-101 provides:

> In order to return and impose a sentence of death the jury must make a written
> finding of one or more of the following:
>
> (a) The defendant actually killed;
> (b) The defendant attempted to kill;
> (c) The defendant intended that a killing take place;
> (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7) (Rev. 2007).  Dickerson writes that, under ***Enmund*** and

***Tison***, for a defendant to be sentenced to death he must have actually killed, attempted to kill,

or intended to kill the victim, and because Mississippi Code Section 99-19-101 adds a fourth

basis, that the defendant "contemplated that lethal force would be employed," Dickerson

maintains that it is unconstitutional.  The Court has rejected similar arguments and held that

Section 99-19-101(7) is constitutional. *See **Batiste***, 121 So. 3d at 871-72 (¶ 178); ***Evans v.***

***State***, 725 So. 2d 613, 684 (¶ 316) (Miss. 1997).

¶79.    Under ***Enmund*** and ***Tison***, a defendant who participated in the commission of a

felony, but did not actually kill or intend to kill the victim, cannot receive the death penalty.

The Court summarized that line of cases and Mississippi's application thereof in ***Evans v.***

***State***:

. . . In *Enmund* and *Tison*, the Supreme Court addressed the constitutionality of the death penalty for defendants who, although involved in the commission of a felony, did not actually kill. In *Enmund*, the Court reversed the death sentence of a defendant who was the driver of the "getaway" car in an armed robbery. The robbery victims were murdered by Enmund's accomplices after they resisted. Enmund was convicted under Florida's felony-murder rule and sentenced to death.

The United States Supreme Court reversed because the Florida Supreme Court affirmed the death penalty in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken. The Court stated:

> Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts.

*Enmund*, 458 U.S. at 797, 102 S. Ct. at 3376-77.

In *Tison v. Arizona*, the Court held that the Eighth Amendment did not prohibit the death penalty in the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to human life. 481 U.S. at 150, 107 S. Ct. at 1684.

In *Enmund*, the Court noted that only eight jurisdictions authorized the death penalty solely for participation in a robbery in which another robber takes life. 458 U.S. at 789, 102 S. Ct. at 3372. Mississippi was among these eight jurisdictions. Following *Enmund v. Florida*, Mississippi amended its capital sentencing scheme to require that a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, and/or contemplated that lethal force would be employed in order to return and impose a sentence of death. Ch. 429, Senate Bill No. 2699, 1983 General Laws of Mississippi. *See* Miss. Code Ann. 99-19-101(7). In *Tison*, the Court noted that Mississippi had modified the capital murder sentencing scheme following *Enmund*. *Id.* at 152, n.4, 107 S. Ct. at 1685, n.4.

Contrary to Evans'[s] assertion, Mississippi requires more than simple felony murder to sentence a defendant to death. Miss. Code Ann. § 99-19-101 allows a jury to consider as an aggravating circumstance the fact that a murder was

committed while the defendant was engaged in the commission of felony. However, after ***Enmund*** and the amendments to our sentencing scheme, that fact alone is insufficient to impose the death penalty. Rather, a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed in order to impose a death sentence. Our sentencing scheme, consistent with ***Tison***, allows a jury to consider as a mitigating circumstance that the defendant was an accomplice whose participation was relatively minor.

In light of ***Enmund*** and ***Tison***, a critical review of our capital sentencing scheme reveals no constitutional infirmities. Moreover, unlike the defendants in ***Enmund*** and ***Tison***, Evans was a major participant in a felony-murder and actually killed his victim. There is no merit to this issue.

***Evans***, 725 So. 2d at 683-84 (¶¶ 311-16). Notwithstanding the fact that the Court has rejected Dickerson's argument and held that Section 99-19-101(7) is constitutional, his claim is unfounded based on the facts of his case. Dickerson was the sole actor in Paula's murder, not an unknowing participant in the underlying felony. Further, the jury found that Dickerson *actually killed* Paula, which certainly satisfies ***Enmund***. Dickerson's argument is without merit.

### C. Constitutionality of Capital Punishment Scheme

¶80. Next, Dickerson alleges that Mississippi's death penalty statute is unconstitutional (1) because the Court fails to conduct proportionality review; (2) because it is applied in a discriminatory and irrational manner; (3) because the statutes are overbroad and vague; and (4) because the death penalty is allowed where the murder was committed during the course of certain felonies, but not authorized in the case of simple murder, no matter how premeditated or atrocious. Dickerson failed to provide any data or citations to support his claim that the death penalty is imposed in a discriminatory and irrational manner. He did not

cite any authority to support his allegation that the Court fails to conduct proportionality review of death sentences, and the allegation is simply unfounded. Thus, those issues are waived.

¶81. To support his claim that the death penalty statutes are overbroad and vague, Dickerson repeats his argument about the heinous, atrocious, or cruel aggravator. As discussed above, that argument is without merit. As to Dickerson's claim that the Mississippi's death penalty scheme is unconstitutional because it is allows the death penalty where the murder was committed during the course of certain felonies, but not authorized in the case of simple murder, no matter how premeditated or atrocious, the Court has rejected the identical argument. *Batiste*, 121 So. 3d at 872 (¶ 181).[5]

### D. Lethal Injection

¶82. Finally, Dickerson contends that execution by lethal injection will violate *Baze v. Rees*, 553 U.S. 35 (2008). Dickerson asserts that death by lethal injection has not yet been determined to pass muster under the standards promulgated in *Baze*, and he asks the Court to remand the case to the trial court to conduct a full hearing in that regard. The State responds that the issue is procedurally barred because Dickerson failed to raise it at trial. Further, the State maintains that the argument has been rejected by the Court. The State is

---

[5] In fact, all of Dickerson's arguments pertaining to aggravating circumstances, constitutionality of the death penalty, and disproportionality of the death sentence have been raised – nearly verbatim – in several recent capital cases by the same attorneys at the Office of the State Public Defender. Each time, the claims have been rejected by this Court. *See Corrothers v. State*, 148 So. 3d 278 (Miss. 2014); *Keller v. State*, 138 So. 3d 817 (Miss. 2014); *Batiste v. State*, 121 So. 3d 808 (Miss. 2013).

correct in both regards. Again, an identical argument was made in ***Batiste*** and the Court

held:

> Batiste claims Mississippi's lethal-injection protocol violates ***Baze v. Rees***, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008), and constitutes cruel and unusual punishment. Because Batiste failed to challenge the method of execution at trial, this issue is procedurally barred. ***Chamberlin v. State***, 55 So. 3d 1046, 1056 (Miss. 2010). Notwithstanding the procedural bar, this issue is without merit. This Court "has held unequivocally that Mississippi's method of lethal injection does not violate the Eighth Amendment." ***Id.*** (citing ***Bennett v. State***, 990 So. 2d 155, 161 (Miss. 2008)). In ***Chamberlin***, we stated:
>
>> If differences exist between Mississippi's execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi's lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop's Eighth-Amendment challenge to Mississippi's lethal-injection procedures, recently announced that "Mississippi's lethal injection protocol appears to be substantially similar to Kentucky's protocol that was examined in ***Baze***." We agree with the Fifth Circuit's analysis, and hold that Bennett's Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.
>
> ***Chamberlin***, 55 So. 3d at 1056 (quoting ***Bennett***, 990 So. 2d at 161) (citations omitted).

***Batiste***, 121 So. 3d at 872-73 (¶182). *See also* ***Corrothers v. State***, 148 So. 3d 278, 324 (¶ 131) (Miss. 2014); ***Keller v. State***, 138 So. 3d 817, 874 (¶¶ 168-70) (Miss. 2014).

Dickerson's argument is without merit.

### IX. Whether Dickerson's death sentence is constitutionally and statutorily disproportionate.

¶83. Dickerson asserts that the death penalty is constitutionally and statutorily disproportionate in the case *sub judice* due to his chronic mental illness. He claims that his "intellectual and cognitive deficits and his other mental health disorders were at least

43

substantial contributing factors to this crime," so the death sentence is "disproportionate to his culpability." As discussed above, the expert testimony did not support a finding a that Dickerson was mentally retarded. During the sentencing phase, the jury heard testimony from a psychologist and a social work professor about Dickerson's personality disorders and deficits in adaptive functioning; former DHS employees about Dickerson's living conditions as a child; and family, friends, and employers about Dickerson's childhood and work abilities. The jury was able to consider all of that evidence in mitigation during sentencing deliberations. They jury found that the aggravating factors outweighed the mitigating factors.

¶84. When reviewing the imposition of the death penalty, in addition to reviewing the merits of all issues raised on appeal, the Court is required to determine:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3) (Rev. 2007). There is no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. As discussed above, the evidence supports the jury's finding of the statutory aggravating factors.

¶85.    Comparing other factually similar cases in which a death sentence was imposed, we

conclude that the death penalty is not excessive or disproportionate in the instant case. The

Court has upheld the death penalty for capital murders committed during the commission of

a robbery.  *See, e.g., Flowers*, 158 So. 3d at 1075 (¶ 166); *Batiste*, 121 So. 3d at 873 (¶ 183);

*Gillett*, 56 So. 3d at 524 (¶ 164).  We have upheld the death penalty in cases where the crime

was particularly gruesome and heinous, as here, where multiple weapons were involved,

multiple wounds were inflicted, and the victim's death was torturous.  *Batiste*, 121 So. 3d

at 870, 873 (¶¶ 172, 183); *King*, 960 So. 2d at 441, 447 (¶¶ 54, 73); *Mitchell v. State*, 792

So. 2d 192, 220-211 (¶ 110) (Miss. 2001).  Finally, we have upheld the death penalty in the

face of a defendant's challenge that the death penalty was disproportionate in light of the

defendant's claims about his own mental health.  *Goff*, 14 So. 3d at 669-72 (¶¶ 202-208)

(bipolar disorder and psychotic features); *Berry v. State*, 703 So. 2d 269, 293-94 (¶¶ 88-92)

(paranoid schizophrenia).  Dickerson's death sentence is not disproportionate to the crime.

### X. Whether the cumulative effect of the errors mandates reversal of the guilty verdict and/or the death sentence.

¶86.    Dickerson claims that the cumulative error doctrine requires reversal of his conviction

and sentence. Under the cumulative error doctrine, where one error, standing alone, may not

warrant reversal, reversal may be required if the errors, taken together, "create such an

atmosphere of bias, passion, and prejudice that they effectively deny the defendant a

fundamentally fair trial."  *Flowers*, 158 So. 3d at 1075 (¶ 168) (quoting *Goff*, 14 So. 3d at

672 (¶ 210)).  In the instant case, we have determined that each issue raised by Dickerson is

without merit. Because there are no individual errors, there is no cumulative error.

45

**Conclusion**

¶87. Dickerson's convictions for capital murder, arson, and armed robbery and sentence of death were properly decided by the jury and are affirmed.

¶88. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH, AFFIRMED. COUNT II: CONVICTION OF ARSON AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF ARMED ROBBERY AND SENTENCE OF FORTY (40) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCES IN COUNT II AND COUNT III ARE TO RUN CONSECUTIVELY TO EACH OTHER.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR, CHANDLER, AND PIERCE, JJ., CONCUR. RANDOLPH, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., LAMAR, CHANDLER, PIERCE, AND COLEMAN, JJ. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ.; CHANDLER, J., JOINS IN PART.**

**RANDOLPH, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶89. I have carefully weighed Presiding Justice Dickinson's call for a judicial overhaul of defining intellectual disability (formerly mental retardation) to include those persons having "reduced intellectual functioning" or "any mental defect or disease," (Dickinson Op. at ¶121), with the majority's urge for conformance with established precedent. I conclude that both the *mea culpa*[6] of Justice Dickinson and the categorization of *Atkins* as confusing

---

[6] Justice Dickinson claims responsibility for the nonexistent ambiguity in the application of *Atkins*. (Dickinson Op. at ¶101). He cites a case note, written prior to his penning *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), which claims, *inter alia*, that the "capital punishment jurisprudence . . . has become . . . a morass." *See* Dickinson Op. at ¶100. The cases relied upon by the unknown author of this note are all pre-*Atkins* cases. This note, while penned at a prestigious university, is not authoritative, as evidenced by its misstatements of the *Atkins* holding: "Although the Court discussed several characteristics of the mentally retarded that make death an especially unsuitable punishment, it refrained

(Dickinson Op. at ¶101) are ill-founded and based upon a false premise, that the mental-health community has "no responsibility" for the definition of an intellectual disability definition. (Dickinson Op. at ¶117). Articles and position statements published by mental-health professionals and their member organizations clearly dispute such a conclusion.

¶90.    The American Association of Intellectual and Developmental Disabilities (AAIDD)[7] has stated, "[w]hen death penalty is an issue, individuals with intellectual disability[8] . . . must . . . continue to be exempt from the death penalty because existing case-by-case determinations of competence to stand trial, criminal *responsibility*, and mitigating factors at sentencing have proved insufficient to protect the rights of individuals with intellectual disability." *Criminal Justice System*, at www.aaidd.org/news-policy/policy/position-statements/criminal-justice (emphasis added) (last visited June 16, 2015).  The AAIDD

---

from endorsing any particular definition of mental retardation. . . ." Note, *Implementing Atkins*, 116 Harv. L. Rev. 2565 (2003).

[7] The AAIDD was formerly known as the American Association on Mental Retardation (AAMR), and the American Association on Mental Deficiency (AAMD).

[8] "'People with intellectual disability (ID)' refers to those with 'significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18,'" as defined by the American Association on Intellectual and Developmental Disabilities (AAIDD) in its manual, *Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock et al., 2010), and the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), published by the American Psychiatric Association (APA, 2013)." *Criminal Justice System*, at www.aaidd.org/news-policy/policy/position-statements/criminal-justice (last visited June 16, 2015). The AAIDD supports the modern terminology of ID and urges courts to follow the United States Supreme Court's lead in adopting this new terminology. *Id.*

47

supports the *Atkins*[9] decision, noting that its amicus brief was cited by the Court "in support of its ruling that the Constitution protects all defendants with intellectual disability." *Intellectual Disability and the Death Penalty*, at www.aaidd.org/news-policy/news/article/2013/10/23/intellectual-disability-and-the-death-penalty (last visited June 16, 2015).

¶91.    "Intellectual disability" is more than just a label; it is a diagnosis which can be made only by a mental-health professional. Comparing Justice Dickinson's suggested instruction with the guidelines set forth by the mental-health professions and adopted by *Atkins* evidences an expansion to include "any mental defect or disease," coupled with an unspecified "reduced intellectual functioning," without any recognized standard. (Dickinson Op. at ¶121). Mental-health professionals devote their life's work to studying and understanding diagnostic criteria of intellectual disability and in establishing a standard for its diagnoses. Defining and establishing those standards is for mental-health professionals. The judiciary is ill-equipped to tinker with the established mental-health professionals' diagnostic criteria. We interpret laws. Following the law as it stands today, there is no trial-court error.

¶92.    The standard articulated by the United States Supreme Court in *Atkins* and adopted by this Court in *Chase*[10] is spot on. *Atkins* and *Chase* do not protect all persons with mental defects or diseases, only those who meet the clinical definition of intellectual disability.

---

[9] *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[10] *Chase v. State*, 873 So. 2d 1013 (Miss. 2004).

Today's majority recognizes that the United States Supreme Court and this Court have adopted and continuously applied the definition of "mental retardation," now referred to as "intellectual disability," as set forth by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association (APA):

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed.1992).

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 308, 122 S. Ct. at 2245 n.3. *See also Foster v. State*, 848 So. 2d 172, 174 (Miss. 2003); *Russell v. State*, 849 So. 2d 95, 146 (Miss. 2003); *Chase*, 873 So. 2d at 1027-28; *Lynch v. State*, 951 So. 2d 549, 558-59 (Miss. 2007). No cases or legislative acts can be found which would dispute the following conclusion:

A state would be on firm ground if it adopted either the AAMR or the APA definition of mental retardation, or if it combined the two. Today, there is very little controversy about the concept and definition of mental retardation.

Richard J. Bonnie[11] & Katherine Gustafson, *The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases*, 41 U. Rich. L. Rev. 811, 821 (May 2007).

¶93.     Furthermore, ***Hall v. Florida***, ___ U.S. ___, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014), the most recent pronouncement from the United States Supreme Court affirming ***Atkins***, addresses the hypotheticals posited by Justice Dickinson. In ***Hall***, the United States Supreme Court held that states' discretion to define intellectual disability for Eighth Amendment purposes is not unlimited. ***Hall***, 134 S. Ct. at 1998. The Supreme Court also directed that the states lack "unfettered discretion to define the full scope of the constitutional protection" and that "***Atkins*** provide[s] substantial guidance on the definition of intellectual disability." ***Hall***, 134 S. Ct. at 1998-99. ***Hall*** also recognized the significant role of the medical and mental-health communities in informing legal determinations of intellectual disability:

That this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability is unsurprising. Those professionals use their learning and skills to study and consider the consequences of the classification schemes they devise in the

---

[11] Bonnie is the Harrison Foundation Professor of Law and Medicine, Professor of Public Policy, Professor of Psychiatry and Neurobehavioral Science, and Director of the Institute of Law, Psychiatry and Public Policy at the University of Virginia. Among other public service appointments, he was asked by the Chief Justice of the Virginia Supreme Court to chair a Commission on Mental Health Law Reform.

diagnosis of persons with mental or psychiatric disorders or disabilities. Society relies upon medical and professional expertise to define and explain how to diagnose the mental condition at issue. And the definition of intellectual disability by skilled professionals has implications far beyond the confines of the death penalty: for it is relevant to education, access to social programs, and medical treatment plans. In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions.

*Id.* at 1993.

¶94. The United States Supreme Court did not place too great a burden on states regarding capital punishment. *Atkins* left only implementation to the States.[12]

Although the Supreme Court in *Atkins* left it to the states to enforce the new constitutional rule, *Atkins* did not leave each state free to define mental retardation. As already indicated, it seems clear that the Supreme Court intended for the states to embrace a clinical definition of mental retardation, as a diagnosable disorder, rather than a legally constructed definition focusing on functional impairments and bearing on diminished culpability. The Court set out, in full, two well-established clinical definitions of mental retardation, one from the American Association on Mental Retardation (AAMR) and one from the American Psychiatric Association (APA). Although the language of these two definitions differs somewhat, they are conceptually identical, requiring significant deficits in intellectual functioning and adaptive behavior and onset before age eighteen.

Bonnie and Gustafson, *The Challenge of Implementing Atkins v. Virginia*, 41 U. Rich. L. Rev. at 818-19.

---

[12] Although many states' legislatures enacted legislation consistent with *Atkins*, Mississippi, along with six other states, has adopted *Atkins* into the common law in the absence of a state statute. *See Myers v. State,* 130 P.3d 262, 266 (Okla. Crim. App. 2005); *Commonwealth v. Miller*, 888 A.2d 624, 630-31 (Pa. 2005); *Ex parte Briseno*, 135 S.W.3d 1, 17-18 (Tex. Crim. App. 2004); *Franklin v. Maynard*, 588 S.E.2d 604, 605 (S.C. 2003); *Ex parte Perkins*, 851 So. 2d 453, 455-56 (Ala. 2002); and *State v. Lott*, 779 N.E.2d 1011, 1014-15 (Ohio 2002). All seven courts adopted language tracking the definitions of mental retardation/mental disability propounded by the AAMR and/or the APA: (1) significantly sub-average intelligence, (2) significant or substantial deficits in adaptive behavior, (3) manifested prior to age eighteen.

¶95. In Virginia, its legislature "chose to use the AAMR definition as their model primarily because the AAMR is the principal professional organization in the field of mental retardation. Its definition is highly respected and also reflects the most current research in the field." Bonnie and Gustafson, *The Challenge of Implementing Atkins v. Virginia*, 41 U. Rich. L. Rev. at 821.

> The diagnosis of mental retardation always involves significant clinical judgment, and thus, the Virginia statute correctly emphasizes conformity with standards of practice generally accepted by the field. The IQ test chosen to be administered must be a "standardized measure generally accepted by the field of psychological testing," and the testing process must be "carried out in conformity with accepted professional practice." These requirements should ensure fair assessments of defendants and reliable results that courts can use with confidence.

> By embracing a clinical definition of mental retardation, the United States Supreme Court put professional standards of measurement, assessment, and diagnosis at the center of *Atkins* adjudications. Fair implementation of *Atkins* requires states to take appropriate steps to ensure that these assessments are held to high standards of quality. States should go to great lengths at all levels--in statutory provisions, administrative guidelines, and in the training of judges, experts, and other court personnel--to ensure that capital defendants are evaluated fairly and accurately.

*Id.* at 825-26.

¶96. In the present case, Dickerson did not present sufficient evidence to support the jury instruction requested. Therefore, there was no trial-court error as to this issue.

**WALLER, C.J., LAMAR, CHANDLER, PIERCE AND COLEMAN, JJ., JOIN THIS OPINION**.

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶97.   I agree that Dickerson's conviction for capital murder should be affirmed.  But because I believe that this Court has inadequately addressed the Eighth Amendment concerns expressed by the United States Supreme Court in *Atkins v. Virginia*, I would reverse Dickerson's death sentence, and I respectfully dissent in part.

¶98.   In *Atkins v. Virginia*, the United States Supreme Court ruled that the Eighth Amendment's ban of cruel and unusual punishment categorically prohibits the execution of the intellectually disabled.[13]  Dickerson argues that he is intellectually disabled, and that the trial judge should have submitted that issue to the jury.  I believe a majority of this Court agrees that the issue of intellectual disability should be submitted to a jury.

¶99.   Dickerson also argues that the prohibition announced in *Atkins* should be extended to include other intellectually impaired persons who do not satisfy the medical criteria to be formally diagnosed as intellectually disabled but who suffer from similar impairments.  I would conclude that this issue is properly resolved by submission to a sentencing-phase jury, and that we must revise our decision in *Chase v. State*[14] to address adequately the Eighth Amendment concerns articulated in *Atkins*.

¶100.  Death is different.[15]  The permanent, irreversible nature of the punishment requires that we carefully scrutinize death-penalty proceedings for error, giving the benefit of every

---

[13] *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[14] *Chase v. State*, 873 So. 2d 1013 (Miss. 2004).

[15] *Randall v. State*, 806 So. 2d 185, 200 (Miss. 2001).

doubt to the offender.[16]  And, while a jury's complex responsibility is to apply the law to the facts of a particular case, appellate courts bear a duty to issue clear, consistent, understandable capital-punishment opinions that are as free as possible from ambiguity and the risk of arbitrary application.  But as one authoritative legal publication has put it:

> capital punishment jurisprudence, with its ambitious dicta and plurality opinions has become a metaphorist's playground: it is a "tangled thicket," a "haphazard maze," a "veritable minefield," a "morass."[17]

¶101.  No area of capital-punishment jurisprudence is more worthy of this criticism than the cases addressing intellectual disability.  And while many of this Court's decisions—including some penned by the author of this concurrence—have contributed fuel for the metaphors, the seeds of this confusion lie in the *Atkins* opinion itself.

### Atkins v. Virginia

¶102.  In 2002, the United States Supreme Court—applying what it appreciated to be the "evolving standards of decency that mark the progress of a maturing society"—declared that execution of intellectually disabled persons "is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of [an intellectually disabled] offender."[18]  Simply stated, the *Atkins* Court held that the execution of intellectually disabled

---

[16] *Id.*

[17] Note, *Implementing Atkins*, 116 Harv. L. Rev. 2565, 2566 (2003) (internal citations omitted).

[18] *Atkins*, 536 U.S. at 321 (citing *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986)).

persons is unconstitutional. And in doing so, the *Atkins* majority set out two reasons for the categorical exemption.

*National Consensus*

¶103. First, the Court declared it "fair to say that a national consensus has developed against" executing intellectually disabled persons.[19] In discerning the national consensus, the *Atkins* Court found that the "clearest and most reliable objective evidence of contemporary values" was "the legislation enacted by the country's legislatures."[20] Since the Court's 1989 opinion in *Penry v. Lynaugh*,[21]

> eighteen states enacted legislation specifically banning the death penalty for people with [intellectual disability], and similar bills were passed by at least one house of the legislature in at least three other states. The *Atkins* Court noted that while the number of states excluding people with [intellectual disability] had increased significantly (only two had so at the time of *Penry*), not a single state had legislated in the opposite direction by reinstating the death penalty for such offenders. Taking account of the twelve states that had abolished the death penalty altogether, execution of a person with [intellectual disability] was forbidden in thirty states in 2002. The federal death penalty statute also precluded death sentences for offenders with [intellectual disability].[22]

---

[19] *Atkins*, 536 U.S. at 304.

[20] *Id.* at 312 (internal citations omitted).

[21] *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) *abrogated by Atkins*, 536 U.S. at 304 (allowing intellectual disability to be considered as a mitigating factor, but refusing to categorically exclude intellectually disabled persons from the death penalty).

[22] Richard J. Bonnie & Katherine Gustafson, *The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases*, 41 U. Rich. L. Rev. 811, 812 (2006-2007) (internal citations omitted).

¶104. The *Atkins* Court observed that, "even in those states that allow the execution of [intellectually disabled] offenders, the practice is uncommon."[23] For example, according to the Court, even in New Hampshire and New Jersey where such executions were allowed, "none [had] been carried out in decades."[24] And so, considering this empirical evidence, the Court declared it "fair to say that a national consensus has developed against it."[25]

*Death-Penalty Jurisprudence*

¶105. As its second reason for announcing the categorical exclusion, the Court drew reasons from its "death-penalty jurisprudence" that were "consistent with the legislative consensus that the [intellectually disabled] should be categorically excluded from execution."[26] The Court found that executing intellectually disabled persons did not accomplish either of the justifications for the death penalty—retribution and deterrence—and that the "reduced capacity" of intellectually disabled persons presented an unacceptable risk of "false confessions," a reduced ability to "make a persuasive showing of mitigation," and a reduced ability "to give meaningful assistance to their counsel."[27]

---

[23] *Atkins*, 536 U.S. at 316.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 318 (citing *Coker v. Georgia*, 433 U.S. 584, 597, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977)) ("In addition to objective evidence, the Constitution contemplates that this Court will bring its own judgment to bear by asking whether there is reason to agree or disagree with the judgment reached by the citizenry and its legislatures.").

[27] *Atkins*, 536 U.S. at 318-21.

¶106. The Court went on to point out that intellectually disabled persons "are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."[28] And finally, the Court worried that "reliance on [intellectual disability] as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."[29]

### The Trouble With *Atkins*

¶107. After determining that the intellectually disabled were categorically exempt from execution, the *Atkins* majority stated:

> To the extent there is serious disagreement about the execution of [intellectually disabled] offenders, it is in determining which offenders are in fact [intellectually disabled]. . . . Not all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus. . . . "[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[30]

¶108. This passage is quite significant and of particular interest to state courts. While this Court has little to do with the skirmishes between the *Atkins* majority and dissents regarding the question of whether there exists a national consensus, it has everything to do with carrying out the decision's mandate. We are left with the task of discerning what it is that we are constitutionally forbidden to do.

---

[28] *Id.* at 320-21.

[29] *Id.* at 321.

[30] *Id.* at 317 (quoting *Ford*, 477 U.S. at 405, 416-17).

¶109.  The passage quoted above has been read to say no more than that the only "serious disagreement about the execution of [intellectually disabled] offenders, [] is in determining which offenders are in fact [intellectually disabled]."[31]  This isolated reading of the statement simply is not accurate.  Courts have no more trouble determining "which offenders are in fact [intellectually disabled]" than they do in finding whose fingerprints are on the gun, or whose DNA was found at the scene.  Experts testify, and the jury decides who it believes.

¶110.  The next sentence is the critical one: "Not all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus . . . ."  This sentence establishes that the true inquiry is not so much about who is intellectually disabled, but about the "national consensus" and what persons—intellectually disabled or not—"fall within the range of intellectually disabled offenders about whom there is a national consensus."  In other words, some intellectually disabled persons will fall within that range, and some will not.

¶111.  The problem lies in the absolute reality, completely overlooked by interpretations of the *Atkins* decision, that the label "mental retardation" or "intellectual disability" is of far less importance than the "national consensus" that persons who possess certain mental deficiencies and communication problems should not be executed.

¶112.  I seriously doubt that the United States Supreme Court would have any concern about the execution of intellectually disabled persons if that label included an I.Q. of 90.  The label is controlled by the mental-health community. Psychiatrists and psychologists are not judges,

---

[31] *Atkins*, 536 U.S. at 317.

criminologists, or legislators.  In developing and changing, from time to time, the definition

of intellectual disability, they have no responsibility for what does and does not qualify a

person for capital punishment.  Indeed, there is widespread disagreement over the proper

definition of "mental retardation" or "intellectual disability," and the various definitions are

in a continual state of change.[32]

¶113.  So it seems to me the problem is not—as many believe the *Atkins* majority stated in

isolation—"in determining which offenders are in fact [intellectually disabled];" the problem

is in making sure the legal definition of intellectual disability—which should be controlled

by the courts, and is not necessarily consistent with the clinical definition—is consistent with

the concerns that led the *Atkins* Court to categorically exempt an entire class of people from

the death penalty.  This is the same path the courts took in developing a legal definition of

insanity.

¶114. Rather than clearly defining for the state courts the constitutional limits and

requirements for the death penalty, the *Atkins* majority left "to the states the task of

developing appropriate ways to enforce the constitutional restriction upon their execution of

_____

[32] To be clear, I do not mean to criticize the mental-health community's definitions of intellectual disability, or that those definitions change from time to time. Psychologists and psychiatrists adopt and amend definitions of intellectual disability to best serve their professional purposes of medical diagnosis and treatment. But the constitutional concerns are with the symptoms—not necessarily the label—of intellectual disability. I simply suggest that we should make sure that changes in the mental-health community's views of what is required for the label do not expand or contract the class of persons exempt from the death penalty under *Atkins*.

sentences."[33]  I refuse to assume the *Atkins* majority meant the constitutional restriction to be no more than a label that is completely controlled by the mental-health community.

¶115.  To illustrate—and bearing in mind that the mental-health community has complete control over its definitions—suppose the mental-health community raised the IQ threshold for mental disability from 75 to 90, and required only one, instead of the current two, deficiencies in adaptive functioning.  I doubt a single justice on the *Atkins* Court, or this Court, would believe a "national consensus" exists to exclude from execution all intellectually disabled persons under that definition.  And further, suppose the Mississippi Legislature decided to define intellectual disability as all persons with an IQ below 20.  I doubt there would exist any reasonable view that persons with an IQ of 25–while not labeled intellectually disabled in Mississippi—are outside the *Atkins* Court's "national consensus."

### *Van Tran v. State*

¶116.  One case that illustrates the arbitrary notion that a mere label is all that should be required to qualify for the *Atkins* Court's national consensus is *Van Tran v. State*, where the defendant—an immigrant from Vietnam—proved the necessary intellectual deficiency and deficits in two or more categories of functional adaptive skills.[34]  But, because he was unable to produce an IQ test or other evidence that his condition had manifested before age eighteen

---

[33] *Atkins*, 536 U.S. at 317(quoting *Ford*, 477 U.S. at 405, 416-17).

[34] Stephen J. Mulroy, *Execution by Accident: Evidentiary and Constitutional Problems with the "Childhood Onset" Requirement in Atkins Claims*, 37 Vt. L. Rev. 591, 592-93 (Spring 2013).

(prior to age eighteen, Van Tran was in the jungles of Vietnam), the courts rejected his *Atkins* claim of exemption from execution.[35] And "Van Tran is not alone."[36]

¶117. The mental-health community develops and refines the various requirements for mental-health conditions such as intellectual disability, with no responsibility or obligation to the judiciary to ensure that its goals and definitions are consistent with judicial, constitutional concerns. So it seems that when the *Atkins* Court set forth the list of reasons and concerns that led to its decision, the Court simply assumed that persons who bore the label "intellectually disabled" would fit—and would continue to fit—within the group of persons about which it found a national consensus. But, given the changes in definition and the potential for future changes that are not subject to any judicial review, I have concluded that this Court can observe the constitutional restrictions set forth by the *Atkins* Court only by adopting a judicial definition of intellectual disability—much the same as we adopted a judicial definition of legal insanity—to be applied by juries for constitutional purposes.[37]

     *Chase v. State*

---

[35] *Id.*

[36] *Id.* at 593 n.15 (citing *Walton v. Johnson* 440 F. 2d 160, 177-78 (4th Cir. 2006); *Burns v. State*, 944 So. 2d 234, 249 (Fla. 2006); *Commonwealth v. Vandivner*, 962 A. 2d 1170, 1188-89 (Pa. 2009); *State v. Strode*, 232 S.W. 3d 1, 17 (Tenn. 2007)).

[37] Once again, my purpose here is not to criticize the definitions adopted by mental-health professionals. Instead, I simply adopt a definition that is consistent with the *Atkins* Court's requirements, and that serves our role as jurists—to enforce the Eighth Amendment's ban of cruel and unusual punishment.

¶118. In 2004, this Court, for the first time, attempted to apply *Atkins* in a post-conviction-relief case in which the petitioner's verdict and sentence already had been affirmed. In *Chase*, we struggled to understand the *Atkins* majority's intended application:

> To fully appreciate and accept that *Atkins* exempts all [intellectually disabled] persons—even those who are minimally [intellectually disabled]—from execution, a careful reading of the majority opinion, as well as both dissents, is required. This is so because of ambiguous statements in the majority opinion which appear to conflict with other statements in the majority opinion, and with the understanding of the majority holding as expressed by [the dissents].[38]

We went on to point out the Court's enigmatic language that continues to give us trouble today:

> To the extent there is serious disagreement about the execution of [intellectually disabled] offenders, it is in determining which offenders are in fact [intellectually disabled]. . . . *Not all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus*. . . . "[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[39]

¶119. After examining other statements in the *Atkins* majority, we concluded that it intended to grant "Eighth Amendment protection from execution to all [intellectually disabled] persons."[40] We then fell into the *Atkins* trap of merely requiring a label defined by the mental-health community. We cited the same definitions cited in *Atkins*, and we set forth a procedure that ultimately required a finding that "[t]he defendant is [intellectually

---

[38] *Chase*, 873 So. 2d at 1026.

[39] *Id.* at 1026 (quoting *Atkins*, 536 U.S. at 317) (emphasis added).

[40] *Chase*, 873 So. 2d at 1027.

62

disabled], *as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association.*"[41]

¶120. I cannot help but conclude that our response to the *Atkins* imperative relied too heavily on the definitions provided by the mental-health community, without taking into account the constitutional concerns of *Atkins*, for which the mental-health community has no responsibility. So I would modify *Chase* by providing a judicial definition of intellectual disability to be used by our trial courts in determining which defendants meet the *Atkins* requirements for exemption from the death penalty.

¶121. I would hold that, in death-penalty cases where an accused pleads the defense of intellectual disability—and, prior to the sentencing trial, produces to the trial judge evidence creating reasonable doubt as whether he may be intellectually disabled—the accused may proceed on the defense. In the sentencing phase, the State should bear the burden of proving to the satisfaction of the jury, beyond a reasonable doubt, that the offender is not intellectually disabled. I would hold that in all such cases the jury should be instructed as follows:

> The court instructs you that persons who are intellectually disabled are ineligible for the death penalty. The State has the burden to prove beyond a reasonable doubt that the defendant is not intellectually disabled. In reaching your decision, you must use the following definition of intellectually disabled: Persons are intellectually disabled if they (1) have substantially reduced intellectual functioning or suffer from any mental defect or disease, (2) and that substantially reduced intellectual functioning, mental defect, or disease causes them to act out of impulse rather than a reasoned judgment of consequences, substantially reduces their ability to appreciate the wrongfulness of their actions, substantially reduces their ability to assist their counsel in their

---

[41] *Id*. at 1029 (emphasis added).

63

defense, or (in cases where the defendant has confessed) creates a substantial risk that the confession was false. If the State has not proven to your satisfaction, beyond any reasonable doubt, that [name of defendant] is not intellectually disabled, you must not return a verdict of death.

This procedure would proceed much the same way as the procedure for the jury's determination of insanity and, like insanity, the above criteria may, but would not need to be, established by expert testimony. I now turn to the case before us.

¶122. The evidence presented with regard to Dickerson's mental condition demonstrated a lack of reasoned judgment and impulsive behavior. Dickerson's aunt explained that when he was a child he thought irrationally. Dr. Criss Lott, an expert in forensic psychology and neuropsychology, noted that Dickerson had a prior diagnosis of schizophrenia, paranoid type. He scored Dickerson at an adjusted full-scale 71 IQ, in the range for intellectual disability. He diagnosed Dickerson as having a cognitive disorder based on deficits in his "ability to plan, to problem solve, to anticipate, to organize." He explained that people with similar deficits "don't anticipate well; they're very impulsive; they don't know how to inhibit or delay a response . . . ." He noted that Dickerson would struggle to adapt to external forces that interfere with a plan and would tend to respond impulsively.

¶123. Dr. Lott explained that Dickerson has at one time or another received diagnoses of schizophrenia, paranoid type; major depressive disorder; and personality disorders with narcissistic features and has been prescribed antipsychotic medications. Lott also found that Dickerson has a cognitive disorder. That disorder was evidenced by Dickerson's deficits in executive function, his ability to anticipate, problem-solve, and understand delayed

gratification. These deficits inhibit one's ability to anticipate consequences, learn from mistakes, and to respond in a rational and nonimpulsive manner.

¶124. Dr. Julie Schroeder summarized executive functioning, stating:

> Executive function is kind of the CEO for our brain. There are activities that are going on in our brains that . . . assist us in . . . planning and initiating tasks independently and bringing them to a conclusion, anticipating possible outcomes of those goals or objectives and the consequences of behavior. And it also helps us to maintain our self control and assess our behavior to determine whether or not we are behaving as one would expect us to behave.

She explained that Dickerson's limitations in executive functioning particularly hampered his impulse control. She also explained the connection between deficits in executive functioning and criminal behavior:

> [P]rolonged stress is probably the most important thing because it disrupts attention and judgment and other behaviors that are related to executive function. . . . And stress is a particularly important issue any time we're dealing with someone with mental health issues.

She also explained that Dickerson scored in the tenth percentile in verbal comprehension, second percentile in perceptual reasoning, ninth percentile in working memory, and fifth percentile in processing speed.

¶125. I would find that Dickerson presented sufficient evidence to put his intellectual disability under the standards I have just articulated in doubt. I would vacate his death sentence and remand this case to the circuit court for a new sentencing proceeding, where Dickerson would be permitted to submit evidence of his potential intellectual disability to a jury. Any other result fails to give the *Atkins* decision its full force.

**KITCHENS AND KING, JJ., JOIN THIS OPINION. CHANDLER, J., JOINS THIS OPINION IN PART.**

65

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014). *following remand.

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So 3d 808 (Miss. 2013).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State,* 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State,* 45 So. 3d 216 (Miss. 2010).

*Goff v. State,* 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

i

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State,* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*,  800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,*  787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*__Shell v. State__, 554 So. 2d 887 (Miss. 1989); __Shell v. Mississippi,__ 498 U.S. 1 (1990) reversing, in part, and remanding; __Shell v. State__, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

__Davis v. State__, 551 So. 2d  165 (Miss. 1989).

__Minnick v. State__, 551 So. 2d 77 (Miss. 1989).

*__Pinkney v. State__, 538 So. 2d 329 (Miss. 1989); __Pinkney v. Mississippi__, 494 U.S. 1075 (1990) vacating and remanding; __Pinkney v. State__, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*__Clemons v. State__, 535 So. 2d 1354 (Miss. 1988); __Clemons v. Mississippi__, 494 U.S. 738 (1990) vacating and remanding; __Clemons v. State__, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

__Woodward v. State__, 533 So. 2d 418 (Miss. 1988).

__Nixon v. State__, 533 So. 2d 1078 (Miss. 1987).

__Cole v. State__, 525 So. 2d 365 (Miss. 1987).

__Lockett v. State__, 517 So. 2d 1346 (Miss. 1987).

__Lockett v. State__, 517 So. 2d 1317 (Miss. 1987).

__Faraga v. State__, 514 So. 2d 295 (Miss. 1987).

*__Jones v. State__, 517 So. 2d 1295 (Miss. 1987); __Jones v. Mississippi__, 487 U.S. 1230 (1988) vacating and remanding; __Jones v. State__, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

__Wiley v. State__, 484 So. 2d 339 (Miss. 1986).

__Johnson v. State__, 477 So. 2d 196 (Miss. 1985).

__Gray v. State__, 472 So. 2d 409 (Miss. 1985).

__Cabello v. State__, 471 So. 2d 332 (Miss. 1985).

__Jordan v. State__, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Manning v. State,* 158 So. 3d 302 (Miss. 2015).

*Byrom v. State,* 2014-DR-00230-SCT (April 3, 2014) (order).

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*Fulgham v. State,* 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied, Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

(Revised June 15, 2015.)